344 F.3d 184
 Rohit PHANSALKAR, Plaintiff-Consolidated-Defendant-Appellee-Cross-Appellant,
v.
ANDERSEN WEINROTH & CO., L.P., G. Chris Andersen, and Stephen D. Weinroth, Defendants-Consolidated-Plaintiffs-Appellants-Cross-Appellees,
AW & CO., INC. Defendant-Appellant-Cross-Appellee.
 No. 02-7928(L).
 No. 02-7984(XAP).
 United States Court of Appeals, Second Circuit.
 Argued: April 9, 2003.
 Decided: September 16, 2003.
 
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED ANDREW J. ROSSMAN, Esq., Akin, Gump, Strauss, Hauer & Fled LLP, New York, NY, for Plaintiff-Consolidated-Defendant-Appellee-Cross-Appellant.
 DANIEL P. LEVITT, Esq., (Shearman & Sterling, on the brief), for Defendants-Consolidated-Plaintiffs-Appellants-Cross-Appellees and Defendant-Appellant-Cross-Appellee.
 Before: JACOBS and STRAUB, Circuit Judges, and WOOD, District Judge.[1]
 PER CURIAM.
 
 
 1
 This is an appeal from a final judgment, entered in the United States District Court for the Southern District of New York (Shira A. Scheindlin, District Judge), awarding Plaintiff-Consolidated-Defendant-Appellee-Cross-Appellant Rohit Phansalkar ("Phansalkar") $4,417,655.40, plus prejudgment interest, on his claim for conversion of shares of stock.
 
 
 2
 This diversity action arises out of the employment relationship that once existed between Phansalkar, an investment banker, and Defendants-Consolidated-Plaintiffs-Appellants-Cross-Appellees Andersen Weinroth & Co., L.P. ("AW" or "the firm"), a small merchant banking firm, and its two partners, G. Chris Andersen ("Andersen") and Stephen Weinroth ("Weinroth"). After a lengthy bench trial involving numerous claims and counterclaims, the district court made the following four determinations, which are at the core of this appeal.[2]
 
 
 3
 First, the district court determined that AW unlawfully converted Phansalkar's shares of stock in an entity called Millenium Cell ("MCEL"). Andersen and Weinroth had sold Phansalkar an equity interest in MCEL out of their own, personal accounts, at a favorable price, as an employment incentive. That interest consisted of 637,902 shares of stock (the "MCEL Shares"). The district court found that the MCEL Shares were part of plaintiff's compensation from AW.
 
 
 4
 Second, the district court concluded that Phansalkar breached his contract with, and his duties of loyalty and good faith to, AW, by failing to disclose his receipt of various benefits (i.e., stock options, stock shares, fees, and business opportunities), which he had received from other companies in consideration of his service on those companies' boards. AW's policy was that such benefits belonged to AW and that employees were to report and pass on those benefits to the firm.
 
 
 5
 Third, the district court held that, pursuant to New York's faithless servant doctrine, Phansalkar's disloyalty required him to forfeit compensation, but only compensation derived from transactions with respect to which he had been disloyal. The district court limited Phansalkar's forfeiture in this manner, based on its interpretation of our decisions in Musico v. Champion Credit Corp., 764 F.2d 102 (2d Cir. 1985) and Sequa Corp. v. GBJ Corp., 156 F.3d 136 (2d Cir.1998),[3] and based on its findings that "Phansalkar did not engage in a scheme to defraud AW" and that Phansalkar's "isolated misdeeds did not permeate his entire employment relationship." Phansalkar II, at *110-11, 2001 WL 1524479 at *34. In keeping with this approach, the district court did not require Phansalkar to forfeit the MCEL Shares, because it found that Phansalkar committed no disloyal acts with respect to MCEL.
 
 
 6
 Fourth, the district court awarded AW some, but not all, of the relief it sought for Phansalkar's breach of contract and breach of fiduciary duty in failing to disclose and to pass on to AW the benefits he received for his service on other companies' boards. The district court granted AW relief with respect to the benefits that were freely transferable (i.e., cash fees and stock shares), but declined to grant relief with respect to certain stock options that were not freely transferable. The district court concluded that AW had failed to prove that it was harmed by Phansalkar's failure to disclose the existence of those options. The district court held that AW was in the same position after discovering this disloyalty, as it would have been if Phansalkar had fulfilled his duties, because AW did not have any right to control options that are held in an employee's name but belong to AW.
 
 
 7
 AW appeals three of the district court's determinations: (1) its decision to limit forfeiture and not to order Phansalkar to forfeit his MCEL Shares and certain other compensation received, (2) its finding that AW converted Phansalkar's MCEL Shares and its calculation of damages on that claim, and (3) its determination that AW is not entitled to any remedy for Phansalkar's failure to disclose his receipt of certain stock options. AW asserts the first and second contentions in the alternative. Phansalkar appeals the district court's use of an allegedly incorrect standard to calculate damages on his conversion claim.
 
 
 8
 For the reasons stated below, we reverse in part and affirm in part. We reverse the district court's decision to limit forfeiture of Phansalkar's compensation to compensation derived from transactions as to which Phansalkar was disloyal. We hold that New York's faithless servant doctrine requires Phansalkar to forfeit all compensation received after his first disloyal act. This forfeiture is required because there was no agreement for Phansalkar's compensation to be determined on a task-by-task basis for tasks he personally performed.
 
 
 9
 We affirm the district court's conclusion that the investment opportunities provided to Phansalkar by AW, and the benefits derived from those opportunities, were compensation, for the purposes of New York's faithless servant doctrine. These investment opportunities and benefits include the opportunity to invest in MCEL and the MCEL Shares.
 
 
 10
 We vacate the district court's determination that AW was not harmed by Phansalkar's failure to disclose the existence of certain stock options that belong to AW. We find that the district court could not properly make this determination, without first considering whether AW had a policy that enabled it to assert control over options held in the name of departing or former employees. If such a policy existed, Phansalkar's failure to disclose the existence of these options may have caused AW harm. We thus remand for further fact finding with respect to any such policy, and, if necessary, for consideration of an appropriate remedy.
 
 
 11
 Our determination that Phansalkar must forfeit the MCEL Shares renders it unnecessary to reach the other issues raised on appeal, including the parties' arguments regarding the district court's finding that AW converted the MCEL Shares and its calculation of damages on that claim.
 
 BACKGROUND
 
 A. Factual Background
 
 
 12
 The crux of this dispute is who is entitled to the various financial interests Phansalkar received, or allegedly should have received, during the final nine months of his employment with AW. The flow of interests to Phansalkar in that time period is a complex matter. This complexity is due in part to the particular staffing, income, and compensation structures at AW, and in part to the wide variety of the transactions at issue. The key facts, as found by the district court, are as follows.
 
 
 13
 
 1. AW's Staffing, Income, and Compensation Structures
 
 
 
 14
 AW is a small, limited liability partnership that finds and creates investment opportunities for itself, its partners, and outside investors. During the relevant time period, AW had three categories of staff: actual partners, nominal partners, and other employees. Andersen and Weinroth were the only actual partners; they were the only signatories to the partnership agreement. Three individuals were nominal partners: Phansalkar, non-party Alan Brumberger ("Brumberger") and non-party James Rawlings ("Rawlings"). AW gave nominal partners the title of "partner" and, in many respects, treated them as actual partners. For the purpose of this decision, we will use the word "partners" to refer to both actual partners and nominal partners.
 
 
 15
 AW's income consisted primarily of cash fees, options, warrants, and "carried interests," derived from the firm's investments. (A "carried interest," in this context, is a percentage of the profits earned by the investors in a particular AW transaction, which percentage was paid to AW.) AW's income also included the compensation earned by AW partners and other employees for their service on boards of directors of companies with which AW did business. AW required that this "Directors' Compensation" be passed on to the firm. Directors' Compensation was a very important source of revenue for AW, because it was the only source of revenue upon which the firm could rely from year to year.
 
 
 16
 Pursuant to AW policy, all Directors' Compensation belonged to the firm, whether that compensation took the form of fees or in-kind compensation, such as stock options. See Phansalkar II, at *48-49, 2001 WL 1524479 at *16. This policy applied even to stock options issued in the director's name, which often were not freely transferable. A June 8, 1999 memorandum to AW partners stated: "when [such options] are realized, the economic value belongs to the firm." Joint Appendix to the Parties' Submissions on Appeal ("Joint Appendix") at A 2297; see also Phansalkar II, at *49-50, 2001 WL 1524479 at *16. To ensure that AW could track and collect Directors' Compensation, AW required its partners and employees to report to AW their directorships and the benefits associated with those directorships.
 
 
 17
 AW's compensation to its partners differed from its compensation to its other employees. AW partners usually did not receive salaries. Instead, they received "Partner Allocations" (i.e., portions of the firm's non-cash income, generally securities, from transactions). Andersen and Weinroth made all decisions regarding each partner's compensation, including decisions regarding the amount and type of compensation to be awarded to each partner each year as a Partner Allocation.
 
 
 18
 Partner Allocations at AW were subject to a vesting policy. Under the policy, one third of an interest vested at the end of each year; at the end of three years, the interest would be fully vested. See Phansalkar II, at *30-31, 2001 WL 1524479 at *11. AW paid out Partner Allocations only when the firm "monetized" (i.e., converted into money) the profit from a particular investment or transaction. See Phansalkar III, at *7-8, 2002 WL 1402297 at **2-3.
 
 
 19
 AW also paid for partners' overhead and expenses, and provided them with opportunities to make certain investments at discounted prices. These "Investment Opportunities," like Partner Allocations, were part of each partner's compensation from the firm. Andersen and Weinroth made all decisions with respect to the value and type of Investment Opportunities awarded to each partner.
 
 
 20
 AW employees who were not partners received salaries, discretionary bonuses, and the opportunity to participate in an equity pool set up by the firm.
 
 
 21
 
 2. Overview of Phansalkar's Employment at AW
 
 
 
 22
 Phansalkar joined AW in or about February 1998 as a nominal partner. AW promised him a salary of $250,000 (which was an exception to its usual practice of not paying salaries to partners), in addition to a share of the Partner Allocations, the amount and content of which was to be determined by Andersen and Weinroth (as described above), in their sole discretion. Throughout his tenure at AW, Phansalkar was treated as a partner. He attended partners' meetings and dinners where firm policy was discussed, he was privy to confidential information, and he was offered opportunities to invest in certain transactions.
 
 
 23
 Phansalkar remained at AW until June 2000, at which time he left to become the Chairman and CEO of Osicom Technologies, Inc. ("Osicom"), an entity with which AW, and specifically Phansalkar, had worked in 1999 and 2000. After Phansalkar left, AW accused him of failing to disclose to AW certain Directors' Compensation and opportunities he received as a result of his service on various corporate boards. AW also took the position that, after Phansalkar left AW, he was no longer entitled to the returns on certain Investment Opportunities that he had been given and had acted upon while at AW.
 
 
 24
 During his last year and a half at AW, Phansalkar worked on four transactions, took advantage of three Investment Opportunities, and sat on the boards of three companies.[4] The district court discussed all of these matters in great detail in Phansalkar II and Phansalkar III, and made exhaustive findings of fact. We summarize the district court's findings, focussing on the work Phansalkar performed for AW, the Directors' Compensation and opportunities he received from other companies, and his disloyalties to AW. We also detail the Investment Opportunities and other compensation that AW awarded to Phansalkar in consideration of his work.
 
 
 25
 
 3. Phansalkar's Work, Directors' Compensation, and Disloyalties
 
 
 
 a. The Zip Transaction
 
 
 26
 In 1999, Phansalkar introduced AW to two opportunities. The first was an opportunity to raise funds for Zip Global Network, Ltd. ("Zip"), a company based in India that was developing a payphone network there. AW accepted the opportunity and raised approximately $10 million for Zip from AW partners and from outside investors. The Zip Transaction closed in September 1999. As a result of the transaction, AW received a cash fee and stock warrants. AW also received the right to designate two directors to the Zip Board of Directors. Technically, this right belonged to an entity called AW Zip, LLC, which AW had created for the purpose of pooling funds for the transaction, and which was managed by AW partners. Through AW Zip, LLC, AW selected Phansalkar as one of its two designees.
 
 
 27
 As a Zip director, Phansalkar received 40,000 options to purchase shares of Zip (the "Zip Options"), and 600 shares of Zip Telecom Holdings, Ltd. (the "Zip Shares").[5] He received the Zip Options on October 15, 1999, and the Zip Shares in early 2000. The district court found that Phansalkar served on the Zip Board, and received the Zip Options and the Zip Shares, as a representative of AW. See Phansalkar II, at *54, 2001 WL 1524479 at **17-18.
 
 
 28
 In violation of firm policy with regard to Directors' Compensation, Phansalkar did not report to AW his receipt of either the Zip Options or the Zip Shares. See id. at *55, 2001 WL 1524479 at *17. In deciding whether Phansalkar's non-disclosure amounted to fraud, the court below found it important that Phansalkar had given Loretta Loomie ("Loomie"), an AW employee, a copy of the Minutes of the Zip Board of Directors Meeting for October 15, 1999 (the "Minutes"), which included a reference to Phansalkar's Zip Options (but not his Zip Shares). The Minutes were kept in an unlocked file cabinet in a hallway in AW's office. In addition, Loomie testified at trial that she was aware of the grant of the Zip Options to Phansalkar. Based on these facts, the court found that, although Phansalkar failed to disclose the Zip Options and the Zip Shares, AW did not show that he intentionally concealed either of them. See id. at *55, 2001 WL 1524479 at *17.
 
 
 b. The Osicom Private Placement
 
 
 29
 The second opportunity to which Phansalkar introduced AW in 1999 was an opportunity to complete two projects for Osicom. AW undertook: (1) to lead a $7.5 million private placement of newly-issued shares of Osicom common stock, and (2) to identify and recruit independent directors and managers for Osicom and its affiliates. AW created FIBR Holdings, LLC ("FIBR") to pool funds for the private placement, and completed the transaction in December 1999. As a result, AW earned $300,000 in cash fees and a carried interest of 20 percent of FIBR's ultimate profit. FIBR received the right to designate one member to the Osicom Board of Directors; it designated Phansalkar.
 
 
 30
 As an Osicom director, Phansalkar received options to purchase 35,000 Osicom shares (the "35,000 Osicom Options") and $3,000 in directors' fees (the "Osicom Directors' Fees"). He received the 35,000 Osicom Options on January 6, 2000 and the Osicom Directors' Fees for meetings attended in the spring of 2000. Just as the district court had found with regard to the Zip Options and Zip Shares, the district court found that Phansalkar received the 35,000 Osicom Options and the Osicom Directors' Fees as a representative of AW, and that Phansalkar failed to disclose those Options and Fees to AW. See Phansalkar II, at *57-58, 2001 WL 1524479 at **18-19. Again, the court found that AW did not establish that Phansalkar intentionally concealed this compensation. See id. at *59, 2001 WL 1524479 at *19.
 
 
 c. The Sorrento Private Placement
 
 
 31
 In early 2000, Phansalkar worked on a private placement of stock for Sorrento, an Osicom affiliate. That deal closed on March 1, 2000. AW invested $1.5 million in the private placement, half of which came from funds that belonged to AW partners and half of which came from funds borrowed by AW; the latter were personally guaranteed by Andersen and Weinroth. Phansalkar invested $60,000. AW also raised $6.5 million from outside investors through an entity AW created, Sorrento Holdings, LLC.
 
 
 32
 As a result of the Sorrento deal, AW received a fee of $1.95 million, which it chose to take in additional Sorrento stock, and a carried interest of 20% on the profit earned on the investment of Sorrento Holdings, LLC. AW also received "warrants and/or options" for identifying candidates to serve as officers and directors for Sorrento. Andersen was appointed to the Sorrento Board of Directors; Phansalkar was appointed to the Sorrento Advisory Board.
 
 
 33
 Andersen was granted 100,000 Sorrento options as a member of the Sorrento Board of Directors; Phansalkar was granted 300,000 Sorrento options as a member of the Sorrento Advisory Board (the "Sorrento Options"). The district court found that Andersen was aware of the grant to Phansalkar because (1) Andersen knew of the relevant option plan (he participated by telephone in a Sorrento Board meeting at which the Board approved the Sorrento Option Plan), and (2) Andersen received a copy of the Plan, which stated that Phansalkar would receive 300,000 options. See Phansalkar II, at *61, 2001 WL 1524479 at *20. The court also found that it was reasonable for Phansalkar to believe that Andersen knew that Phansalkar had been granted 300,000 Sorrento options. See id.
 
 
 34
 The district court made a specific finding that Phansalkar eventually received only 100,000 options from Sorrento, not the 300,000 options he was initially granted. See id. at *61, n.17, 2001 WL 1524479 at *20, n.17; Phansalkar III, at *22, 2002 WL 1402297 at **7-8.
 
 
 d. The Sync Research/Entrada Networks Transaction
 
 
 35
 In the spring and summer of 2000, AW coordinated the private placement of shares of Sync Research, Inc. ("Sync"), and a subsequent merger of Sync with a business unit of Osicom (the "Networks Access" unit). AW created Entrada Holdings, LLC, to pool funds for the private placement. The merger was completed in or around August 2000, after Phansalkar had left AW and joined Osicom. The merged entity became Entrada Networks. AW's compensation for its work on the private placement and the merger consisted of a cash fee (equal to a percentage of the investment by Entrada Holdings, LLC in the private placement) and a 20% carried interest on the profits earned by Entrada Holdings, LLC.
 
 
 36
 On May 19, 2000, before the merger, Sync filed a document with the Securities and Exchange Commission ("SEC") that stated that Sync intended to appoint Phansalkar to the Entrada Networks board after the merger. On June 15, 2000, after Phansalkar had agreed to join Osicom, Osicom granted Phansalkar options to purchase 50,000 shares of still-prospective Entrada Networks (the "50,000 Entrada Options"). In August 2000, after the merger was completed, Osicom appointed Phansalkar to the Entrada Networks Board, and granted him another 100,000 Entrada Networks options (the "100,000 Entrada Options").
 
 
 37
 The district court found that Phansalkar secured his Entrada Networks Board seat in or around April 2000, while still employed by AW, even though he was not officially appointed until August 2000. See Phansalkar II, at *20, *64, 2001 WL 1524479 at **7-8, *21. The district court found that Phansalkar failed to disclose this fact to AW and failed to attempt to secure an Entrada Networks Board seat for AW. See id. at *64, 2001 WL 1524479 at *21. The court also found that, in April 2000, Phansalkar failed to disclose to AW that Sync had offered to place an AW designee on its board, and that Phansalkar had declined the offer. See id.
 
 
 38
 Notwithstanding these disloyalties, the district court rejected AW's contention that all of the Entrada Options belonged to AW, or would have belonged to AW, absent Phansalkar's omissions as an AW employee. See id. at *65-66, 2001 WL 1524479 at *21. First, the district court found that neither set of options was granted to Phansalkar in his capacity as an AW employee, and hence that neither set belonged to AW. See id. Second, the court found that AW had failed to prove that it would have received any of the Entrada Options directly, had AW known of and accepted the offer for a seat on the Sync board, or had Phansalkar sought to secure a seat for AW on the still-prospective Entrada Networks board. See Phansalkar III, at *27, 2002 WL 1402297 at **9-10.
 
 
 3. Phansalkar's Investment Opportunities
 
 
 39
 Phansalkar took advantage of three Investment Opportunities made available to him at AW. The first of these, and the most significant in the context of this litigation, was Phansalkar's investment in Millenium Cell.
 
 
 a. Millenium Cell
 
 
 40
 In late 1998, AW began working on MCEL and committed to raise $1 million in equity to develop a small unit of a corporation that was working on a concept for using sodium borohydride as a source for hydrogen fuel. Andersen, Weinroth, Brumberger, and Rawlings were all among the original investors in MCEL; each invested in his individual capacity. Phansalkar declined the opportunity to invest at that time.
 
 
 41
 In December 1999, Andersen and Weinroth again offered Phansalkar the opportunity to invest in MCEL; they offered to sell him up to $100,000 worth of their own equity interests. Andersen and Weinroth made the offer on terms very favorable to Phansalkar, i.e., at the same price paid by the original investors. The district court found that Andersen and Weinroth made this offer to encourage Phansalkar to stay at the firm. See Phansalkar II, at *35, 2001 WL 1524479 at **12-13. The court also found that "Phansalkar was offered the opportunity to purchase [the] MCEL Shares at a discounted price, and he clearly thought this offer was a `good deal.'" Id. at *99, 2001 WL 1524479 at *30.[6] Phansalkar invested $60,000 in MCEL in or around February 2000, and delivered one check in the amount of $30,000 to Andersen and one check in the amount of $30,000 to Weinroth. Andersen and Weinroth deposited the checks in their personal checking accounts.
 
 
 42
 At the time of Phansalkar's investment, MCEL was preparing for an Initial Public Offering ("IPO") and had not yet issued any common stock certificates. Phansalkar helped AW find private investors for MCEL in May 2000 and assisted in the solicitation of underwriters for the IPO.
 
 
 43
 Prior to the IPO, the equity interests in MCEL were specified in shares of stock; each owner's interest was memorialized in AW's internal schedules regarding MCEL (the "MCEL Ownership Schedules"). Those Ownership Schedules show that Phansalkar owned 637,902 shares of MCEL in the spring of 2000. The MCEL IPO eventually occurred on August 9, 2000.
 
 
 44
 The district court also found that Phansalkar "sold" 252,000 of his 637,902 MCEL Shares to Arthur Kowaloff ("Kowaloff"), a friend of his. See id. at *42, 2001 WL 1524479 at *14. Phansalkar testified that he made a "co-investment" with Kowaloff, that Kowaloff paid Phansalkar $25,000, for a 25/60 share of Phansalkar's interest in MCEL. See id. AW was not aware of this until May 2000, when Phansalkar (along with all other MCEL investors) was asked to identify designees to whom he wished to transfer portions of his MCEL Shares.[7]
 
 
 b. Sorrento
 
 
 45
 As discussed above, in early 2000 Phansalkar contributed $60,000 to AW's investment in the Sorrento private placement (AW's investment totaled $1.5 million). Only AW partners were permitted to participate in the $1.5 million investment. Phansalkar believed that the investment was a bargain. See Phansalkar III, at *23, 2002 WL 1402297 at *8.
 
 
 46
 Phansalkar had not received shares of Sorrento stock or any other return on his $60,000 investment in Sorrento, at the time of the district court's third and final decision in this action. The return on the investment was not to be paid out until AW repaid the $750,000 it had borrowed to fund the investment, because that loan was secured by the stock that AW had purchased. See id. at *24-25, 2002 WL 1402297 at **8-9.
 
 
 c. Headway
 
 
 47
 In 2000, Andersen was offered an opportunity to buy one million shares in Headway at a price much lower than market price. Andersen was given this opportunity as a director of Headway. See Andersen Test., Joint Appendix at A 308-309. Andersen offered to share this investment opportunity with the other AW partners, without any vesting requirement. Phansalkar invested $50,000. In August 2000, AW delivered 44,000 shares of Headway common stock to Phansalkar in return for Phansalkar's $50,000 investment. Phansalkar apparently sold those shares thereafter and made a $40,000 profit. See Phansalkar III, at *29, 2002 WL 1402297 at *10.
 
 
 4. Phansalkar's Compensation from AW
 
 
 a. 1999 Compensation
 
 
 48
 There were two components to Phansalkar's compensation in 1999: salary and Partner Allocations. He received $250,000 in salary, in monthly installments, and was awarded his share of the Partner Allocations in December 1999. The latter consisted of 20% of the warrants that AW received from the Zip transaction; 17.5% of the carried interest in the Osicom private placement; and 7.5% of AW's interest in Treasure Master, a transaction that AW completed in 1999 but on which Phansalkar did not work.
 
 
 49
 Around the time Andersen and Weinroth told Phansalkar what his share of the 1999 Partner Allocations would be, they also told Phansalkar that his salary would be discontinued in 2000. Phansalkar expressed dissatisfaction at both his share of the Partner Allocations and the decision to discontinue his salary. He told Andersen and Weinroth that he was considering leaving AW. Soon after this discussion, Andersen and Weinroth offered Phansalkar the opportunity to invest in MCEL (as discussed above). Although Weinroth testified that he did not recall the MCEL offer being made in response to Phansalkar's dissatisfaction at his 1999 compensation, both Andersen and Weinroth testified that they made the offer "to provide Phansalkar with an incentive to stay at AW and in contemplation of Phansalkar staying on at the firm." Phansalkar II, at *34, 2001 WL 1524479 at *12.
 
 
 b. 2000 Compensation
 
 
 50
 In 2000, Phansalkar received neither salary nor Partner Allocations. Instead, his compensation consisted of the three Investment Opportunities discussed above and a $100,000 loan from AW. The district court reviewed each Investment Opportunity separately and made a specific finding that each was compensation, because each was offered to Phansalkar at a discounted price. See Phansalkar II, at *97-99, 2001 WL 1524479 at **29-30 ($60,000 MCEL investment); Phansalkar III, at *23, 2002 WL 1402297 at *8 ($60,000 Sorrento investment); id. at *29, 2002 WL 1402297 at *10 ($50,000 Headway investment).
 
 
 c. Compensation Actually Paid to Phansalkar
 
 
 51
 At the start of this litigation, Phansalkar had already received his entire $250,000 salary for 1999, but had not yet received any of his share of the 1999 Partner Allocations, because AW had not monetized any of the relevant interests. In addition, Phansalkar had received (and sold) the 44,000 Headway shares from his Headway investment. He had not received the MCEL Shares or any return on his Sorrento investment, and he had not repaid the $100,000 loan.
 
 
 5. Phansalkar's Departure from AW
 
 
 52
 In early June 2000, Phansalkar told Andersen that Phansalkar had been offered the position of Chairman and CEO of Osicom. Andersen responded positively. Phansalkar informed Andersen that he believed that his work at Osicom, which would be to oversee the sale of Osicom's assets and/or the merger of Osicom with another entity, would take approximately 18 to 24 months. Andersen encouraged Phansalkar to return to AW afterwards.
 
 
 53
 On June 6, 2000, Phansalkar orally accepted the offer to become Chairman and CEO of Osicom. He signed an employment agreement on June 9, 2000, under which he was to receive (1) a $250,000 annual salary, (2) options to purchase 450,000 shares of Osicom common stock, and (3) a cash fee if Osicom merged with another entity or was acquired in a deal that closed within six months.
 
 
 54
 Soon thereafter, Phansalkar and Andersen attempted to memorialize in writing Phansalkar's interests in various AW transactions. Andersen drafted a memorandum to file on or about June 19, 2000. Andersen's secretary typed the memorandum, dated it June 19, 2000, and gave a copy to Phansalkar. Phansalkar made several handwritten comments on his copy and gave it back to Andersen's secretary, who incorporated those comments. After Phansalkar provided his initial comments, several other draft memoranda dated June 19, 2000 were generated, and were apparently exchanged between Phansalkar and Andersen. Most of those draft memoranda contain different handwritten comments by Phansalkar.
 
 
 55
 Every one of the draft memoranda states that Andersen and Weinroth had sold Phansalkar 637,902 shares of MCEL for $60,000, and that the shares were to be distributed following MCEL's IPO. Each draft also notes that Phansalkar held 100,000 Sorrento Options, as a result of his service on the Sorrento Advisory Board. None of the drafts mentions any of the Directors' Compensation Phansalkar received by virtue of sitting on the Zip and Osicom boards. Phansalkar and Andersen never finalized a memorandum or agreed on Phansalkar's interests.
 
 
 56
 The relationship between Phansalkar and AW began to deteriorate in late June 2000. In May or June 2000, Phansalkar learned that the board of directors of Meret, Sorrento's parent company, had decided to remove Andersen from the Sorrento Board. Phansalkar did not inform Andersen of this decision at the time, but did inform him of it in a telephone conversation in late June, in response to Andersen's general inquiry about changes on the Sorrento Board. Phansalkar also told Andersen that Phansalkar had been chosen to replace another director (not Andersen) on the Sorrento Board. Andersen was angered by this news and accused Phansalkar of trying to replace him.
 
 
 57
 In June or July 2000, Weinroth instructed another AW employee to transfer back to Andersen and Weinroth the 637,902 shares that were attributed to Phansalkar on the May 2000 MCEL Ownership Schedule and for which Phansalkar had paid $60,000. This transfer was made and was reflected in a revised Ownership Schedule.
 
 
 58
 In a letter to Phansalkar dated September 6, 2000, Andersen stated: "As we have previously discussed and as [Weinroth] reiterated in your recent conversation, you are aware that you do not have a position in Millennium Cell." Joint Appendix at A 2781. The district court found that this September 6, 2000 letter was the first notice Phansalkar received of the transfer of his MCEL Shares back to Andersen and Weinroth. See Phansalkar II, at *44, 2001 WL 1524479 at *15. In the letter, Andersen also informed Phansalkar that AW would use the $60,000 paid by Phansalkar for the MCEL Shares as an offset against AW's $100,000 personal loan to Phansalkar.
 
 
 59
 AW learned sometime between June 2000 and September 2000 that Phansalkar had received the Zip Options, the Zip Shares, the 35,000 Osicom Options, and the Osicom Directors' Fees as Directors' Compensation. At that time, Phansalkar had not exercised any of the options, and he had not sold the Zip Shares.
 
 
 B. Procedural History
 
 
 60
 On September 11, 2000, AW sued Phansalkar in the Supreme Court of the State of New York, New York County, for breach of contract, breach of fiduciary duty, and conversion, alleging that Phansalkar had been a disloyal employee for the last nine months of his tenure at AW and had appropriated property and opportunities belonging to AW. On October 16, 2000, Phansalkar filed this action against AW and immediately removed to the district court AW's pending state court action. Phansalkar asserted claims for conversion, breach of contract, quantum meruit, unjust enrichment and promissory estoppel, based on AW's failure to deliver the MCEL Shares and failure to pay Phansalkar promised compensation.
 
 
 61
 The cases were consolidated before Judge Scheindlin. In the first part of a two-phase bench trial the district court heard Phansalkar's claims regarding the MCEL Shares (i.e., claims for conversion, and, in the alternative, breach of contract or unjust enrichment), and AW's affirmative defenses to those claims, including its affirmative defense of breach of duties of loyalty and good faith. The district court also assessed damages relevant to the MCEL Shares. In the second part of the trial, the district court considered Phansalkar's claims for breach of contract, quantum meruit, and unjust enrichment, with regard to compensation other than the MCEL Shares; AW's affirmative defenses to those claims; and AW's own claims for breach of contract, breach of fiduciary duty, and conversion, with regard to Phansalkar's Directors' Compensation. The district court also received evidence with respect to relevant damages.
 
 
 62
 The court concluded that AW unlawfully converted Phansalkar's MCEL Shares. It also determined that Phansalkar had breached his duties to AW of loyalty and good faith. The court specifically found that Phansalkar breached his duty of loyalty by failing to disclose to AW (1) the Zip Options, (2) the Zip Shares, (3) the Osicom Fees, (4) the Osicom Options, (5) the offer of a Sync Board seat to AW, and (6) the offer of an Entrada Networks Board seat to Phansalkar personally. However, the district court concluded that AW had not proved that Phansalkar committed fraud with respect to any of these omissions, in that AW had not proved that Phansalkar intentionally concealed the Directors' Compensation.
 
 
 63
 Notwithstanding the district court's conclusion that Phansalkar had breached his duties to AW of loyalty and good faith, it rejected AW's argument that, pursuant to New York's faithless servant doctrine, AW was entitled to forfeiture of all of Phansalkar's compensation (including his MCEL Shares) from the date of his first disloyal act. Instead, the court limited the forfeiture to transactions on which Phansalkar had worked and as to which Phansalkar was disloyal, and found that "[b]ecause Phansalkar's disloyal conduct in no way tainted his involvement in MCEL, the MCEL Shares should not be forfeited." Phansalkar II, at *111 2001 WL 1524479 at *34. The court carefully crafted its approach to the forfeiture issue, attempting to adhere to the principles articulated in our opinions in Musico v. Champion Credit Corp., 764 F.2d 102 (2d Cir.1985) and Sequa Corp. v. GBJ Corp., 156 F.3d 136 (2d Cir.1998). The court calculated damages on Phansalkar's MCEL conversion claim in the amount of $4,417,655.40 plus prejudgment interest.
 
 
 64
 After the second phase of trial, the court limited Phansalkar's forfeiture on the same basis, and ordered him to forfeit the warrants from the Zip transaction and the carried interest in the Osicom private placement that he had received as a part of his share of the 1999 Partner Allocations. The court specifically declined to order Phansalkar to forfeit (1) any of his $250,000 salary for 1999, see Phansalkar III, at *39, 2002 WL 1402297 at *13, (2) the interest in Treasure Master that he received as part of his share of the 1999 Partner Allocations, see id., or (3) the profit he earned on his Headway investment, see id. at *70, 2002 WL 1402297 at *22. The court also ruled generally that Phansalkar need not forfeit compensation that he received in the form of opportunities to invest in AW deals. See id. at *55-56, 2002 WL 1402297 at *17.[8]
 
 
 65
 Separate from its forfeiture decision, the court found Phansalkar liable for breach of fiduciary duty and breach of contract, with respect to his failure to report and to turn over to AW the Directors' Compensation that he had received. The court limited the extent of AW's recovery, however, because it found that AW had established damages resulting from certain of Phansalkar's disloyal acts, but not from others. The court granted remedies for Phansalkar's failure to convey to AW the Osicom Directors' Fees and the Zip Shares, given that those interests were readily quantifiable and transferrable to AW. In contrast, the court granted no remedies for Phansalkar's failure to disclose the Osicom Options and the Zip Options that had been issued in Phansalkar's name. The court reasoned that AW was not harmed by this disloyalty, because AW was, and remained, entitled only to the proceeds from the options, and was not entitled to decide when they should be exercised. Because "AW ha[d] not proven that it had a right to make decisions regarding unexercised options [held in an AW employee's name] or that it could derive economic value from such options (i.e., by hedging)," AW was still simply "the holder of a contingent right to the economic value of [the Zip and Osicom Options] once they are realized." Phansalkar III, at *58, 2002 WL 1402297 at *18.[9]
 
 DISCUSSION
 
 A. Standard of Review
 
 
 66
 Following a bench trial, we set aside findings of fact only when they are clearly erroneous, and we give due regard to the trial court's credibility determinations. See Fed.R.Civ.P. 52(a); Travellers Int'l, A.G. v. Trans World Airlines, Inc., 41 F.3d 1570, 1574 (2d Cir.1994); Banker v. Nighswander, Martin & Mitchell, 37 F.3d 866, 870 (2d Cir.1994). However, we review de novo the district court's conclusions of law and its resolution of mixed questions of law and fact. See Travellers Int'l, 41 F.3d at 1575; Banker, 37 F.3d at 870.
 
 
 67
 We also review de novo the district court's interpretation and application of state law. See Santalucia v. Sebright Transp., Inc., 232 F.3d 293, 297 (2d Cir. 2000). "Where the substantive law of the forum state is uncertain or ambiguous, the job of the federal courts is carefully to predict how the highest court of the forum state would resolve the uncertainty or ambiguity." Travelers Ins. Co. v. 633 Third Assocs., 14 F.3d 114, 119 (2d Cir.1994). In doing so, we must give "fullest weight" to the decisions of a state's highest court, and we must give "proper regard" to the decisions of a state's lower courts. Id.; see also Santalucia, 232 F.3d at 297. We may also consider the decisions of federal courts construing state law. See Travelers Ins., 14 F.3d at 119; AXA Marine and Aviation Ins. (UK) Ltd. v. Seajet Indus. Inc., 84 F.3d 622, 626 (2d Cir.1996).
 
 
 B. Forfeiture of Compensation
 
 
 68
 The pivotal question on appeal is whether the district court ordered Phansalkar to forfeit too little of the compensation awarded to him by AW in 1999 and 2000. If it did, and if Phansalkar should have been ordered to forfeit his interest in MCEL, we must reverse the district court's judgment of over four million dollars in Phansalkar's favor. In reviewing this question, we recognize that the district court faced a formidable task in grappling with this sprawling litigation. We also commend the court for its concerted effort to adjudicate even-handedly the parties' overlapping claims. We find, however, that Phansalkar was ordered to forfeit too little.
 
 
 69
 We reverse because our prediction with respect to the direction of New York law is different from that made by the lower court. We conclude that New York's faithless servant doctrine should be interpreted to require Phansalkar to forfeit all compensation awarded to him after October 15, 1999, the date his disloyalty began, including any interest in MCEL. Because Phansalkar loses his right to the MCEL Shares, he cannot challenge AW's retention of them. It is thus unnecessary to consider the issues raised by both parties with regard to Phansalkar's conversion claim.
 
 
 1. New York's Faithless Servant Doctrine
 
 
 70
 New York law with respect to disloyal or faithless performance of employment duties is grounded in the law of agency, and has developed for well over a century. See Murray v. Beard, 102 N.Y. 505, 7 N.E. 553 (1886). We apply this law to the relationship between Phansalkar and AW, as the district court did, notwithstanding the fact that Phansalkar was denominated a "partner" and is, in certain respects, dissimilar to the salaried or commission-compensated agents discussed below.[10] These dissimilarities do not alter the fact that Phansalkar was unquestionably an agent of AW, and therefore assumed an agent's duties.
 
 
 71
 Under New York law, an agent is obligated "to be loyal to his employer and is `prohibited from acting in any manner inconsistent with his agency or trust and is at all times bound to exercise the utmost good faith and loyalty in the performance of his duties.'" Western Elec. Co. v. Brenner, 41 N.Y.2d 291, 295, 392 N.Y.S.2d 409, 360 N.E.2d 1091 (1977) (quoting Lamdin v. Broadway Surface Adver. Corp., 272 N.Y. 133, 138, 5 N.E.2d 66 (1936)). "One who owes a duty of fidelity to a principal and who is faithless in the performance of his services is generally disentitled to recover his compensation, whether commissions or salary." Feiger v. Iral Jewelry, Ltd., 41 N.Y.2d 928, 928, 394 N.Y.S.2d 626, 363 N.E.2d 350 (1977) (citing Restatement (Second) of Agency (1958), § 469). Moreover, a "principal is entitled to recover from his unfaithful agent any commission paid by the principal." Wechsler v. Bowman, 285 N.Y. 284, 292, 34 N.E.2d 322 (1941); see also Maritime Fish Prods., Inc. v. World-Wide Fish Prods., Inc., 100 A.D.2d 81, 474 N.Y.S.2d 281, 287 (1st Dep't 1984) (employer is entitled to the return of compensation paid employee during period of disloyalty). It does not "make any difference that the services were beneficial to the principal, or that the principal suffered no provable damage as a result of the breach of fidelity by the agent." Feiger, 41 N.Y.2d at 928-29, 394 N.Y.S.2d 626, 363 N.E.2d 350.
 
 
 72
 As discussed above, the district court concluded that Phansalkar breached his duties of loyalty and good faith by failing to disclose (1) the Zip Options, (2) the Zip Shares, (3) the Osicom Fees, (4) the Osicom Options, (5) the offer of a Sync Board seat, and (6) the offer of an Entrada Networks Board seat. Based on these breaches, the district court determined that Phansalkar should be required to forfeit compensation, but only that compensation derived from transactions on which Phansalkar had worked and as to which he was disloyal. AW now challenges the district court's decision to limit Phansalkar's forfeiture.
 
 
 73
 In response, Phansalkar does not dispute the district court's findings that he breached his duties of loyalty and good faith.[11] Instead, he defends the district court's determination that New York law supports the limitation of a disloyal employee's forfeiture to compensation derived from transactions on which the employee worked and as to which the employee was disloyal. He also argues, in the alternative, that the district court erred in requiring any forfeiture. We address the latter contention first, and then turn to the question of whether the district court should have ordered Phansalkar to forfeit even more compensation than it did.
 
 
 a. Misconduct Warranting Forfeiture
 
 
 74
 Phansalkar argues that his misconduct does not warrant the forfeiture of any compensation, because his misconduct was "simply a failure to disclose," and because the district court made an explicit finding that he did not intend to defraud AW. Phansalkar asserts that all New York decisions that require forfeiture involve fraud or intentional wrongdoing by the employee. We reject this argument and find that Phansalkar's actions and omissions warrant forfeiture.
 
 
 75
 New York courts have used two different standards to determine whether an employee's misbehavior warrants forfeiture. Both standards derive from decisions of the New York Court of Appeals from the late nineteenth century. The Court of Appeals enunciated the first standard in 1885 in Turner v. Konwenhoven, where it stated in dictum that a disloyal employee forfeits promised compensation only when the "misconduct and unfaithfulness... substantially violates the contract of service." 100 N.Y. 115, 120, 2 N.E. 637 (1885); see also Abramson v. Dry Goods Refolding Co., 166 N.Y.S. 771, 773 (1st Dep't App. Term 1917) (relying on Turner's dictum and stating that an employee forfeits promised compensation only where his disloyalty "permeates the employee's service in its most material and substantial part"). Lower New York courts have followed Turner's dictum and found agents' disloyalty to be "substantial" in a variety of circumstances.[12] They have found disloyalty not to be "substantial" only where the disloyalty consisted of a single act, or where the employer knew of and tolerated the behavior.[13]
 
 
 76
 The New York Court of Appeals enunciated the second standard for determining whether an employee's misbehavior warrants forfeiture in 1886 in Murray v. Beard, where it stated:
 
 
 77
 An agent is held to uberrima fides in his dealings with his principal, and if he acts adversely to his employer in any part of the transaction, or omits to disclose any interest which would naturally influence his conduct in dealing with the subject of the employment, it amounts to such a fraud upon the principal, as to forfeit any right to compensation for services.
 
 
 78
 102 N.Y. at 508, 7 N.E. 553.
 
 
 79
 We first highlighted this passage in Musico (as discussed further below) because it suggests that New York maintains a strict rule against limiting a faithless servant's forfeiture. We highlight it now because it also suggests that misconduct by an employee that rises to the level of a breach of a duty of loyalty or good faith is sufficient to warrant forfeiture. The New York Court of Appeals confirmed this suggestion in 1936 in Lamdin v. Broadway Surface Advertising Corp., where it held that an employee who "fell below the standard required by the law of one acting as an agent or an employee of another" forfeits salary due. 272 N.Y. at 138, 5 N.E.2d 66; see also Feiger, 41 N.Y.2d at 929, 394 N.Y.S.2d 626, 363 N.E.2d 350 (no forfeiture where employee "was not guilty of any breach of fidelity").
 
 
 80
 Notwithstanding the existence of these two standards, New York courts have not reconciled any differences between them, or defined the circumstances, if any, in which one standard should apply rather than the other. Notably, the New York Court of Appeals has not mentioned its dictum in Turner, since it decided that case. We need not delve further into these questions, however, because we find that Phansalkar's behavior warrants forfeiture under both standards.
 
 
 81
 Phansalkar's misconduct warrants forfeiture under the standard enunciated in Turner, because Phansalkar's disloyalty was not limited to a single, isolated incident, but rather occurred repeatedly, in nearly every transaction on which he worked. Phansalkar breached his duties of loyalty and good faith with respect to his work with Zip, Osicom, Sync, and Entrada Networks. The only transaction for which Phansalkar had substantial responsibility and was completely loyal was the Sorrento transaction. Phansalkar's disloyalties lasted for many months, and persisted boldly through an opportunity to correct them in June 2000, when Phansalkar and Andersen discussed the various interests accumulated during Phansalkar's tenure. We conclude that where disloyalty occurs in four out five of an employee's primary areas of responsibility and continues over many months, it "substantially violates" the terms of an employee's service.
 
 
 82
 Our conclusion is also based in part on the fact that Phansalkar was one of five primary actors at AW and was entrusted with funds that were part of the firm's one reliable source of income. As Phansalkar was told when he joined the firm, AW required its partners and employees sitting on boards to report and contribute to the firm all Directors' Compensation and opportunities. The reason for this was that the partnership relied upon these funds to give the partnership a stable income that could be counted on through good times and bad, e.g., even when transactional business was scarce. Phansalkar thus breached a critical duty when he failed to disclose his receipt of this income and these opportunities, which belonged to AW. We find that Phansalkar's disloyalty "permeate[d] [his] service in its most material and substantial part." Abramson, 166 N.Y.S. at 773.[14]
 
 
 83
 Phansalkar's misconduct warrants forfeiture also under the standard enunciated in Murray and Lamdin, because Phansalkar unquestionably violated specific duties owed to AW. As discussed above, the district court found that Phansalkar breached his duties by failing to disclose six different interests or opportunities that he received as a representative of AW.
 
 
 84
 New York law is clear that an employee "is prohibited from acting in any manner inconsistent with his agency or trust." Lamdin, 272 N.Y. at 138, 5 N.E.2d 66. "[A]bsent an agreement otherwise, an employee who makes a profit or receives a benefit in connection with transactions conducted by him on behalf of his employer is under a duty to give such profit or benefit to his employer, whether or not it was received by the employee in violation of his duty of loyalty." Western Elec. Co., 41 N.Y.2d at 295, 392 N.Y.S.2d 409, 360 N.E.2d 1091 (citing Restatement (Second) of Agency §§ 388, 403 (1958)). When an employee violates this duty, "[n]ot only must the employee or agent account to his principal for secret profits but he also forfeits his right to compensation for services rendered by him if he proves disloyal." Lamdin, 272 N.Y. at 138, 5 N.E.2d 66.
 
 
 85
 Here, Phansalkar acted in a manner inconsistent with his agency by withholding from AW cash, stocks, and other interests that belonged to AW and that should have been turned over to the firm, as a part of the firm's only reliable source of income. He also acted in a manner inconsistent with his agency by specifically declining Sync's offer to place an AW designee on its Board, without having told AW of the opportunity. In addition, he repeatedly violated his affirmative duty to give AW the Directors' Compensation he received on AW's behalf. These breaches are more than sufficient to warrant forfeiture.
 
 
 86
 Finally, we reject Phansalkar's argument that his misconduct does not warrant forfeiture because the district court found that he did not intend to defraud AW when he failed to disclose his Directors' Compensation and other benefits received. The district court made this finding in the context of rejecting AW's claim that Phansalkar's compensation agreement was voidable because of fraud; the court concluded that AW could not prove the requisite scienter for this claim because AW failed to show that Phansalkar took any affirmative steps to conceal the benefits he received. See Phansalkar II, at *90-91, 2001 WL 1524479 at *28. We find nothing in New York law to suggest that a specific intent to defraud is necessary to render misconduct sufficient to warrant forfeiture. See, e.g, Lamdin, 272 N.Y. at 137, 5 N.E.2d 66 (where employee advances his own interests by procuring due bills instead of cash and, in doing so, does harm to his employer's interest, misconduct is sufficient to warrant forfeiture, in the absence of the employer's acquiescence); cf. Beatty v. Guggenheim Exploration Co., 223 N.Y. 294, 305, 119 N.E. 575 (1918) (Crane, J., dissenting) (disagreeing with majority determination that disloyal employee could not recover compensation, and arguing that such a determination was improper because there was no showing that employee acted in bad faith or with malice).
 
 
 87
 The record shows that Phansalkar intended for AW not to receive certain income and benefits, and to that end he not only withheld information from AW but also declined the offer to AW of a Sync Board seat. The record also shows that Phansalkar intended to keep at least some of these benefits for himself — because he knowingly received and retained them without ever disclosing them to AW. In taking these actions, Phansalkar disregarded his affirmative duty to act in his employer's best interests. See Maritime Fish Prods., 474 N.Y.S.2d at 286. We find that Phansalkar acted with sufficient knowledge of his omissions, and their consequences, to warrant forfeiture under New York law.
 
 
 88
 We now turn to whether the district court should have limited Phansalkar's forfeiture as it did.
 
 
 b. Limiting Forfeiture Ordered Against a Faithless Servant
 
 
 89
 Early decisions by the New York Court of Appeals suggest that New York's law of forfeiture requires disloyal agents to forfeit all compensation, without limitation. More recent decisions by lower New York courts, however, have endorsed the principle that faithless servant forfeitures can be limited in specified circumstances. We first discussed this development in Musico, 764 F.2d at 113, and review it briefly here.
 
 
 90
 In Murray v. Beard, the New York Court of Appeals stated that a disloyal employee "forfeit[s] any right to compensation for services." Murray, 102 N.Y. at 508, 7 N.E. 553 (1886) (emphasis added). The Court of Appeals applied this rule in that case to deny a timber broker's claim to commissions due for arranging a sale of timber, because the broker had undertaken competing obligations to different dealers. The Court of Appeals quoted Murray's language fifty years later in Lamdin, and affirmed the dismissal of a suit by a disloyal employee for the balance of salary due to him. See Lamdin, 272 N.Y. at 138-39, 5 N.E.2d 66. Although the Lamdin decision stated that a disloyal agent forfeits "any right" to compensation, that statement was dictum, given that in Lamdin the employer had not sought forfeiture of salary already paid to the disloyal employee.
 
 
 91
 Since these decisions, New York's lower courts have endorsed limiting forfeiture to compensation paid during the time period of disloyalty. This limitation of forfeiture developed in the context of cases in which agency agreements apportioned compensation to "periods of time." Musico, 764 F.2d at 113.
 
 
 92
 In Musico, this Court considered whether New York courts would relax the law on forfeiture even further, to allow an employee to keep compensation for the tasks he performed loyally, during the time period in which he was disloyal in other work. We held that New York law would permit such relaxation where: (1) the parties had agreed that the agent will be paid on a task-by-task basis (e.g., a commission on each sale arranged by the agent), (2) the agent engaged in no misconduct at all with respect to certain tasks, and (3) the agent's disloyalty with respect to other tasks "neither tainted nor interfered with the completion of" the tasks as to which the agent was loyal. Id. at 114. We held that where these three criteria are met, a disloyal employee forfeits only compensation earned in connection with the specific tasks as to which he was disloyal; he retains compensation earned in connection with the specific tasks as to which he was loyal. In Musico the agents had entered into four separate contracts with the principal. We found that the agents' disloyalty affected only two of the four contracts. Accordingly, we held that the agents forfeited only compensation earned pursuant to the two contracts as to which the agents were disloyal. See id.
 
 
 93
 We noted in Musico that limitation of forfeiture by time period and by task reflected the position taken by the Restatement (Second) of Agency, §§ 469 and 456 (1958).[15] See Musico, 764 F.2d at 113. We highlighted the fact that the Restatement explicitly states that the only circumstance in which forfeiture can be limited to compensation for particular tasks is where the contract itself allocates compensation among tasks. See id.; Restatement (Second) of Agency § 469 (1958) (an agent who wilfully and deliberately breaches his contract of service "is not entitled to compensation even for properly performed services for which no compensation is apportioned"). Our holding in Musico adhered to the Restatement's limitation.
 
 
 94
 We subsequently reaffirmed Musico's reasoning in Sequa. Sequa involved a consulting agreement that specified that the agent would receive a particular fee for each leveraged leasing transaction he completed (the agreement stated that the agent's fee for each transaction would be one-half percent of the purchase price of the capital asset, plus ten percent of the "residual value" of the asset when resold). See Sequa, 156 F.3d at 140. The agent consulted on over forty transactions under the contract during the time period at issue. The district court found that the agent was disloyal with respect to only one of those transactions, and ordered the agent to forfeit only his fee on that transaction. See id. at 146. We affirmed this decision. See id. at 147.[16]
 
 
 95
 In affirming, we considered and rejected an argument that a disloyal agent's forfeiture should be even more limited. In Sequa, the agent argued that he should not be required to forfeit his entire fee on the one transaction as to which he was disloyal, because the disloyal act affected only a very small component of the transaction (i.e., the disloyalty was limited to misstatement of a $29,000 expense, in the context of a very large transaction on which the agent earned a $900,000 fee). We rejected this argument, based on our concern that we should not relax New York's rule of forfeiture any further than we had done in Musico, in part because no New York state court had yet endorsed the relaxation we allowed in Musico. We pointed out that our Musico limitation thus had a "tenuous posture," and hence that in Sequa we were being "relatively generous" to limit the agent's forfeiture to the fees from the one transaction as to which he was disloyal, rather than to require forfeiture of the fees from all transactions. Sequa, 156 F.3d at 147.
 
 
 96
 The New York Court of Appeals has never specifically delineated the appropriate limitations of forfeiture (if any) under the faithless servant doctrine. As noted above, New York's lower courts have limited forfeiture to the time period of disloyalty, but appear never to have been faced with the question whether forfeiture should further be limited to compensation for specific tasks as to which the agent was disloyal.[17] No reported New York state court decision has mentioned Musico or Sequa. Thus, as was the case at the time of our decision in Sequa, New York courts have given us no reason to retreat from, or to expand, our holding in Musico.[18]
 
 
 2. The Decision Below
 
 
 97
 The district court limited Phansalkar's forfeiture based on its interpretation of our decisions in Musico and Sequa. The court summarized its view of Musico and Sequa as follows: "[T]ransaction-by-transaction apportionment of forfeiture is appropriate where (1) an employee did not engage in a `wide-ranging scheme' to defraud his employer, and (2) the incidents of disloyalty `did not extend to or taint all the dealings between the parties.'" Phansalkar II, at *109, 2001 WL 1524479 at *33 (citations omitted) (quoting the district court decision in Sequa, 1996 WL 745448, at *79, and Musico, 764 F.2d at 114, respectively).
 
 
 98
 The district court's approach goes farther than either Musico or Sequa in limiting forfeiture. In light of our concern that even our Musico rule should now be considered "tenuous," we believe that we should not relax the law of forfeiture any more than we did in Musico.
 
 
 99
 With one exception,[19] the only reported decisions applying "transaction-by-transaction" limitation of forfeiture are Musico and Sequa. In each of these two cases, there was an agreement (or several agreements) that the agent would be paid only a defined amount for his completion of each of several specific tasks or transactions; transaction-by-transaction forfeiture has not been applied in the absence of such an agreement. It thus has not been applied in cases in which the employee is paid a salary, or receives compensation derived from transactions on which he did not work. The existing limitation has the advantage of drawing a clear line, and of not embroiling courts in deciding how much general compensation should be forfeited, where the general compensation was awarded while the agent was acting disloyally in some, but not all, of his work. We adhere to this limitation.
 
 
 100
 As described above, Phansalkar's 1999 compensation agreement with AW specified that he would be paid $250,000 in salary, and that he would be given Partner Allocations, the value and nature of which were to be determined later, solely at the discretion of Andersen and Weinroth. Phansalkar's 2000 compensation agreement specified that he would be given Partner Allocations, but not a salary. Neither agreement specified that Phansalkar would be paid a particular fee or receive a particular benefit for each transaction he completed. The opportunities that Phansalkar received in 1999 and 2000 to make certain investments were left entirely to the discretion of Andersen and Weinroth.
 
 
 101
 The compensation Phansalkar actually received in 1999 and 2000 was derived from (1) transactions for which he had substantial responsibility, (2) transactions for which he had limited responsibility, and (3) transactions for which he had no responsibility. For instance, in 1999, Andersen and Weinroth decided to pay Phansalkar Partner Allocations for the Zip and Osicom transactions, for which he had substantial responsibility, and the Treasure Master transaction, for which he had no responsibility. In 2000, Andersen and Weinroth gave Phansalkar the opportunity to invest on favorable terms in Sorrento, for which he had substantial responsibility, in MCEL, for which he had limited responsibility, and in Headway, which was not even an AW transaction.
 
 
 102
 We believe that forfeiture cannot appropriately be limited to only some transactions in these circumstances, where the agreement calls for general compensation, and does not limit compensation to specific amounts paid for the completion of specific tasks.
 
 
 3. Phansalkar's Forfeiture
 
 
 103
 Pursuant to the principles articulated above, Phansalkar is required to forfeit all compensation awarded to him after October 15, 1999, the date upon which he received but did not report his Zip Options, and thus the date upon which his disloyalty began.
 
 
 104
 Phansalkar's forfeiture should include, in addition to the forfeiture already ordered by the district court, (1) the portion of Phansalkar's $250,000 salary paid from October 15, 1999 to the end of 1999, (2) his interest in Treasure Master received in December 1999 as part of his share of the 1999 Partner Allocations, and (3) his interests in, and any benefits received from, his MCEL and Headway investments, which he made in 2000.
 
 
 a. Investment Opportunities as Compensation
 
 
 105
 In reaching our decision that Phansalkar must forfeit his interests in his MCEL and Headway investments, we reject his final argument regarding forfeiture. Phansalkar contends that the investment benefits he received, or should have received, from the opportunities to invest in MCEL and Headway, are not compensation for the purposes of New York's faithless servant doctrine, because Phansalkar was required to risk his own capital to receive those benefits. Phansalkar further contends that, because those investment benefits are not compensation, they cannot be subject to forfeiture.
 
 
 106
 No New York court has decided whether a disloyal employee should forfeit benefits received from investment opportunities provided at a discounted price by his employer. Cf. McDougal v. Apple Bank for Sav., 200 A.D.2d 418, 606 N.Y.S.2d 215, 216 (1st Dep't 1994) (raising, but not deciding, question of "whether the rule regarding a faithless employee's forfeiture of compensation applies to plaintiff's rights under the option agreements" (citation omitted)). The district court found that Phansalkar's investment benefits were compensation, because the investments were offered to him "in [c]onnection with his [s]ervice at AW," Phansalkar II, at *33, 2001 WL 1524479 at *12, at a "discounted price," id. at *99, 2001 WL 1524479 at *30. The district court drew upon decisions holding that investment opportunities and the benefits of those opportunities may be considered compensation for the purpose of federal taxation and securities law. See, e.g., Comm'r of Internal Revenue v. Lo Bue, 351 U.S. 243, 247, 76 S.Ct. 800, 100 L.Ed. 1142 (1956) (employee realized taxable gain when he received and then exercised nontransferable stock options to purchase common stock in employer's company at below market price); United States v. Ostrander, 999 F.2d 27, 30-31 (2d Cir.1993) (opportunity to purchase securities, if regarded as a benefit by the recipient, can be "thing of value" or "compensation" for purposes of federal securities laws).
 
 
 107
 We agree with the district court that, for the purposes of New York's faithless servant doctrine, investment opportunities — like Phansalkar's opportunities to invest in MCEL and Headway — are a form of compensation. When an employer makes an investment opportunity available to an employee to reward him for his work and to give him an incentive to continue working for the employer, that opportunity and any benefit realized should be subject to forfeiture like any other form of compensation. The fact that an employee must use his own capital to take advantage of such an opportunity does not require a different conclusion.
 
 
 108
 The effect of ordering Phansalkar to forfeit his interest in MCEL is slightly different from the effect of ordering Phansalkar to forfeit his interest in Headway. This is because AW withheld (or withdrew) the MCEL Shares from Phansalkar before he realized any value from those Shares. In contrast, AW delivered 44,000 shares of Headway stock to Phansalkar, and he then sold those shares for a profit. Thus, with respect to MCEL, there is no need to quantify the investment benefit provided to Phansalkar. Because AW has maintained control over the MCEL Shares, Phansalkar simply forfeits any right to them.[20] With respect to Headway, there is a need to quantify the investment benefit provided. The profit Phansalkar made when he sold the Headway shares appears to be the appropriate measure of the benefit provided. However, because this point was not fully developed below, we remand to the district court on this issue.[21]
 
 
 B. AW's Stock Options in Phansalkar's Name
 
 
 109
 The final issue on appeal is how to treat the stock options that Phansalkar received as Directors' Compensation, which belong to AW, but are still in Phansalkar's name. As discussed above, AW sued Phansalkar for failing to disclose these options, on theories of breach of contract and breach of fiduciary duty. The district court held that, with respect to the two sets of options which belong to AW and as to which Phansalkar acted disloyally (the 40,000 Zip Options and the 35,000 Osicom Options), AW is entitled only to the money realized when the options are exercised.[22] The court declined to grant AW any specific remedy, such as being given the right to direct the exercise of the options at a particular point in time, because it found that AW's right to the options was not prejudiced by Phansalkar's disloyalty.
 
 
 110
 The lower court reasoned, implicitly if not explicitly, that because AW could not prove that it had the right to decide when options held in the name of a current employee could be exercised, AW should not be given that power over options held in the name of a former employee. The court apparently believed that such a remedy would place AW in a better position with respect to Phansalkar than it was with respect to a current employee. The court thus declined to formulate any remedy for the Zip and Osicom Options, and held that AW would simply remain the "holder of a contingent right to the economic value of those options once they are realized." Phansalkar III, at *57-61, 2002 WL 1402297 at **17-19.
 
 
 111
 We vacate the district court's finding that AW is in the same position today with respect to the Zip and Osicom Options as it would have been had Phansalkar fulfilled his duties as an employee. The district court made this determination without first considering whether AW's ability to control stock options held in the name of a former employee was any different than its ability to control stock options held in the name of a current employee. We find that the district court should have engaged in further fact finding as to the existence of a policy that would have permitted AW to control the Zip and Osicom Options (if AW had known about them), once Phansalkar informed AW of his intent to leave the firm, or after he actually left. If such a policy existed, and Phansalkar's disloyalty prevented or frustrated AW's ability to assert its rights under that policy, then the district court must find that AW was harmed by Phansalkar's disloyalty and consider what remedy is appropriate to redress that harm.[23] On remand, the district court may consider any failure or delay on AW's part to demand that Phansalkar exercise the options, or to supply Phansalkar with any capital necessary for him to do so. It may also take note of any restrictions on Phansalkar's ability to exercise the options.
 
 CONCLUSION
 
 112
 We reverse the district court's decision to limit Phansalkar's forfeiture to that compensation derived from transactions as to which Phansalkar was disloyal. Phansalkar must forfeit all compensation received after his first disloyal act. This includes (1) the portion of Phansalkar's $250,000 salary paid from October 15, 1999 to the end of 1999, (2) his interest in Treasure Master, and (3) his interests in, and any benefits received from, his MCEL and Headway investments.
 
 
 113
 With respect to his Headway investment, Phansalkar must pay to AW the profit he made when he sold the Headway shares that he had received in return for this $50,000 investment. We remand to the district court to determine whether AW is entitled to receive any interest on that profit.
 
 
 114
 With respect to his MCEL investment, AW must return to Phansalkar the $60,000 that he invested in MCEL. We remand to the district court to determine whether AW should be permitted to offset the $60,000 against the $100,000 loan that the district court ordered Phansalkar to repay to AW. We also remand to the district court to determine whether Phansalkar is entitled to receive any interest on that $60,000.
 
 
 115
 We remand to the district court to resolve any issues that may arise in connection with Kowaloff's alleged purchase from Phansalkar of 252,0000 shares of MCEL.
 
 
 116
 We remand to the district court to consider any claims with respect to Phansalkar's $60,000 investment in Sorrento.
 
 
 117
 We affirm the district court's conclusion that the investment opportunities provided to Phansalkar by AW, and any benefits derived from those opportunities, were compensation for the purpose of New York's faithless servant doctrine.
 
 
 118
 We vacate the district court's determination that AW is in the same position today with respect to the Zip and Osicom Options as it would have been in had Phansalkar fulfilled his duties as an employee. We remand for consideration of whether AW had a policy that enabled it to assert control over options held in the name of departing or former employees and, if necessary, for consideration of an appropriate remedy with respect to the Zip and Osicom Options.
 
 
 119
 We affirm the judgment of the district court in all other respects.
 
 
 
 Notes:
 
 
 [1]
 The Honorable Kimba M. Wood, District Judge of the United States District Court for the Southern District of New York, sitting by designation
 
 
 [2]
 The district court issued three opinions in this action that are relevant to the questions presented on appeal. In the first, the district court denied AW's motion for partial summary judgment on Phansalkar's claim that AW converted certain shares of stockPhansalkar v. Andersen Weinroth & Co., 175 F.Supp.2d 635 (S.D.N.Y.2001) ("Phansalkar I"). The district court then bifurcated the action for trial, conducting proceedings in September 2001 and April 2002. The district court's findings of fact and conclusions of law are contained in two opinions, Phansalkar v. Anderson Weinroth & Co., 00 Civ. 7872, 2001 U.S. Dist. LEXIS 19406, 2001 WL 1524479 (S.D.N.Y. Nov. 29, 2001) ("Phansalkar II") and Phansalkar v. Andersen Weinroth & Co., 00 Civ. 7872, 2002 U.S. Dist. LEXIS 11764, 2002 WL 1402297 (S.D.N.Y. June 26, 2002) ("Phansalkar III").
 
 
 [3]
 We used the phrase "apportionment of forfeiture" inMusico, 764 F.2d at 112, to mean the limitation of forfeiture to compensation on transactions as to which the agent has been disloyal. In this opinion, we use the phrase "limitation of forfeiture," which is more precise.
 
 
 [4]
 The record suggests that Phansalkar did not work on any significant transactions during his first year at the firm, and neither party has suggested that his service during that year is at issue
 
 
 [5]
 The district court also found that Phansalkar was promised a $2,500 director's fee from ZipSee Phansalkar II, at *9, 2001 WL 1524479 at *3. That fee is not at issue here, because Phansalkar disclosed the promise of that fee to AW in writing, see Memorandum of January 12, 2000 from Weinroth to AW Staff with Phansalkar's handwritten notations, Joint Appendix at A 2311, and Zip never paid that fee to Phansalkar, see Phansalkar Test., Joint Appendix at A 1160-61.
 
 
 [6]
 The district court did not make a specific determination of what the market price of MCEL was at the time of Phansalkar's investment. Instead, it concluded that the price was "discounted" and emphasized that Phansalkar "believed he was purchasing his shares at a below market price."Phansalkar II, at *33, 2001 WL 1524479 at * 12.
 
 
 [7]
 AW contends on appeal that Phansalkar's sharing of the MCEL investment opportunity with Kowaloff, without Andersen and Weinroth's knowledge or approval, was an act of disloyalty. AW also contends that Phansalkar violated a restriction in the MCEL operating agreement by transferring part of his interest to Kowaloff
 Phansalkar argues that AW has waived this argument, because AW failed to raise it below. See Medforms, Inc. v. Healthcare Mgmt. Solutions, Inc., 290 F.3d 98, 109 (2d Cir. 2002). Phansalkar points out that Judge Scheindlin specifically stated that "AW has not alleged any misconduct by Phansalkar with respect to his MCEL Shares." Phansalkar II, at *110, 2001 WL 1524479 at **33-34.
 In response to Phansalkar's waiver argument, we note that AW's Corrected Proposed Findings of Fact and Conclusions of Law contains an allegation that Phansalkar's "purchase of [the MCEL Shares] was fraudulent and done under false pretenses," because he concealed from Andersen and Weinroth that he was making the purchase jointly with Kowaloff. Joint Appendix at A 3168. However, we need not address AW's contention regarding disloyalty with respect to MCEL, because we decide, on other grounds, that Phansalkar must forfeit the MCEL Shares.
 
 
 [8]
 We note that, even though the district court found that Phansalkar's $60,000 investment in Sorrento was part of his 2000 compensation, the court did not specifically reject AW's forfeiture argument with respect to this investment. (In contrast, it did specifically reject the forfeiture argument with respect to Phansalkar's MCEL and Headway investments.) We also note that it is not clear whether AW even argued to the court below that Phansalkar should be ordered to forfeit his Sorrento investmentSee AW's Supplemental Proposed Findings of Fact and Conclusions of Law, Joint Appendix at A 4247-48. The only claim to the Sorrento investment specifically addressed by the court was Phansalkar's claim that AW had failed to deliver the shares due to him. See Phansalkar III, at *72, 2002 WL 1402297 at *22-23. The district court rejected this claim, concluding that Phansalkar was not presently entitled to a return, but would be entitled to his pro rata share once AW's loan and associated expenses are paid and any profits realized.
 Because the record does not clearly reflect whether AW argued to the court below that Phansalkar should forfeit the $60,000 Sorrento investment, and because AW's brief on appeal does not specifically address this point, we do not now disturb the district court's disposition of Phansalkar's Sorrento investment. Instead, we remand to the sound discretion of the district court for consideration, consistent with this opinion, of any claim that Phansalkar should be required to forfeit this investment. We note that such a claim may be deemed waived.
 
 
 [9]
 InPhansalkar III, the district court also reiterated its conclusions (1) that Phansalkar's disloyalty with respect to the Sync and Entrada Networks board seats did not deprive AW of the Entrada Options or otherwise harm AW, see Phansalkar III, at *59, 2002 WL 1402297 at *18, and (2) that Phansalkar received only 100,000 Sorrento Options, and that AW knew of those options but never instructed him to do anything with them, see id. at *22-23, 2002 WL 1402297 at **7-8. We affirm these findings of fact, as well as the district court's decision to deny AW's claim for relief with respect to these options. [See infra 210, n. 22.]
 
 
 [10]
 The parties agree that New York law applies to this diversity action. The parties also stipulated for the purposes of this litigation that Phansalkar was not actually a partner at AWSee Phansalkar II, at *2, n.1, 2001 WL 1524479 at *1 n.1. Thus, the particular rights and obligations of a partner under New York law are not at issue in this case.
 
 
 [11]
 Although Phansalkar does not challenge these findings, AW argues that they should have been broader. AW asserts that the district court should have found Phansalkar disloyal with respect to the removal of Andersen from the Sorrento Board, negotiations concerning Sorrento in the summer of 2000, and, as noted above, Kowaloff's involvement in Phansalkar's MCEL investment. We need not address these arguments, because we hold that Phansalkar's other disloyalty warrants forfeiture of all compensation after October 15, 1999; thus, these arguments would not affect our decision
 
 
 [12]
 See, e.g., Sundland v. Korfund Co., 260 A.D. 80, 20 N.Y.S.2d 819, 821-22 (1st Dep't 1940) (allegations that employee stole cork from employer at "frequent intervals throughout the entire period of his service" are sufficient, if proven, as defense to employee's claim to share of profits due); Abramson, 166 N.Y.S. at 773 (allegations that employee persuaded defendant's other employees to leave defendant's employ, and tried to lure defendant's customers away are sufficient, if proven, to state defense to action by employee for bonus); Pictorial Films v. Salzburg, 106 N.Y.S.2d 626, 629 (Sup.Ct.N.Y.Co.1951) (forfeiture of profits appropriate where jury found that agents had fraudulently removed from employer's files employer's contract with another corporation, and had secretly appropriated employer's royalty checks due pursuant to that contract); cf. Bon Temps Agency, Ltd. v. Greenfield, 212 A.D.2d 427, 622 N.Y.S.2d 709, 710 (1st Dep't 1995) (holding that forfeiture of all commissions earned after first disloyal act would be appropriate if employer could establish that two instances of secretly receiving commissions were not isolated, or that employee's activities in establishing a competing company went beyond mere preliminary steps and rose to the level of actual competition).
 
 
 [13]
 See Schwartz v. Leonard, 138 A.D.2d 692, 526 N.Y.S.2d 506, 508 (2d Dep't 1988) (single act of disloyalty — a lawyer removing files that he had been working on from defendant's office and then starting a law practice of his own — was not "persistent pattern of disloyalty" and thus did not warrant any forfeiture); Bravin v. Fashion Week, Inc., 73 Misc.2d 974, 342 N.Y.S.2d 971, 974 (1973) (no substantial violation of contract of service, and no forfeiture, where employer continued employment of a person who allegedly was insubordinate, made threats, and sent obscene writings).
 
 
 [14]
 We note that the district court made an explicit finding that Phansalkar's disloyal acts were "isolated misdeeds" that did not amount to a "`scheme' to defraud the firm," and that "did not permeate his service at AW or taint his other transactions while at the firm."Phansalkar II, at * 110, 2001 WL 1524479 at **33-34. The district court made this finding in the context of deciding to limit Phansalkar's forfeiture, not in the context of deciding whether forfeiture was warranted in the first instance. The district court explicitly relied on Turner and its progeny, and used those decisions to bolster the court's interpretation of the "Musico/Sequa approach to forfeiture." Id. at *107, 2001 WL 1524479 at **32-33.
 The district court's reliance on Turner and its progeny for this purpose was misplaced. These decisions set forth a standard for determining whether certain misconduct warrants forfeiture; they do not address the extent to which a particular forfeiture should be limited.
 We also find that the district court's assessment of Phansalkar's disloyal acts was flawed. The district court found that the disloyal acts did not "permeate" his other service, based primarily on the fact that Phansalkar generated a great deal of income for AW through his work on the Zip, Osicom, Entrada, and Sorrento transactions, and the fact that he did nothing disloyal with respect to the MCEL Shares. Where an employee's misconduct occurs in well over the majority of his areas of responsibility and continues over many months, that employee cannot avoid a finding that he "substantially violated" the terms of his service by simply pointing out that his work was valuable to his employer, and establishing that he was loyal with respect to projects for which he had no particular personal responsibility.
 
 
 [15]
 Although the New York Court of Appeals and lower New York courts have not specifically relied upon the Restatement to limit forfeiture under the faithless servant doctrine, the Court of Appeals has relied on the Restatement for the proposition that a faithless servant is "generally disentitled to recover his compensation, whether commissions or salary." Feiger, 41 N.Y.2d at 928, 394 N.Y.S.2d 626, 363 N.E.2d 350 (emphasis added) (citing Restatement (Second) of Agency § 469 (1958)).
 
 
 [16]
 We emphasize what we believe was implicit in our decision to affirm the district court's decision inSequa. The facts underlying the agency relationship in Sequa — the fact that there existed a written consultancy agreement in which the agent's compensation was determined on a per-transaction basis, and the fact that the agent's misdeeds occurred in only one of over forty transactions — brought the district court's ruling well within the conditions set forth in Musico, pursuant to which limitation of forfeiture is proper.
 To the extent that the court below interpreted Sequa as permitting a more lenient approach toward forfeiture than that applied in Musico, we note that the similarity of compensation arrangements in both cases (i.e., in each the agreement provided for task-by-task payment) is more important than the distinction in the number of agency agreements (i.e., there were four agency agreements in Musico and only one agency agreement in Sequa).
 
 
 [17]
 See, e.g., GRG Group, Inc. v. Ravenal, 247 A.D.2d 201, 668 N.Y.S.2d 352, 352 (1st Dep't 1998) (affirming partial summary judgment for defendants on their counterclaims for fraud and breach of fiduciary duty and approving forfeiture of $500,000 in management fees and brokerage commissions for the years 1991-1993, where "the evidence demonstrated disloyalty during those years and there is no basis in the record for apportionment"); Royal Carbo Corp. v. Flameguard, Inc., 229 A.D.2d 430, 645 N.Y.S.2d 18, 19 (2d Dep't 1996) (employees who "surreptitiously organized a competing organization" while in plaintiff's employ "forfeited their right to compensation for services rendered from July 1, 1991, until their termination on December 6, 1991" (presumably, the period of disloyalty)); see also Soam Corp. v. Trane Co., 202 A.D.2d 162, 608 N.Y.S.2d 177, 178 (1st Dep't 1994) (agent corporation, which had entered into letter agreement with defendant company to represent defendant and to sell defendant's air-conditioning equipment, must forfeit all commissions, because plaintiff promoted competitor's equipment for sale; such forfeiture is not an "unconscionable penalty" given "New York's strict application of the forfeiture doctrine"); Bon Temps Agency Ltd. v. Greenfield, 184 A.D.2d 280, 584 N.Y.S.2d 824, 826 (1st Dep't 1992) (dismissing employment placement agency employee's counterclaim for fees due for tasks completed (without specifying relevant time periods, or relationship of fees claimed to disloyal acts), because employee surreptitiously received fees for placing two fellow employees in positions, and established and operated a company in direct competition with plaintiff employer during period of employment); cf. Bon Temps Agency, Ltd. v. Greenfield, 212 A.D.2d 427, 622 N.Y.S.2d 709, 710 (1st Dep't 1995) (reversing and remanding grant of summary judgment to employer who sought to recoup all commissions paid to employee for work performed during period of disloyalty).
 
 
 [18]
 Federal district courts have considered whether New York law would permit limiting forfeiture by task. However, they generally have not confronted the issues presented in the instant caseSee, e.g., Sequa Corp. v. Gelmin, 91 Civ. 8675, 1996 WL 745448 (S.D.N.Y. Dec. 31, 1996) aff'd in relevant part, 156 F.3d at 147; Interpool Ltd. v. Patterson, 874 F.Supp. 616, 620-22 (S.D.N.Y.1995) (carefully discussing Musico's holding, but refusing to limit forfeiture to commissions earned on transactions as to which the agent was disloyal, in part because the court interpreted Musico as applying only where there are multiple agency agreements); Battle Fowler v. Brignoli, 765 F.Supp. 1202, 1205 (S.D.N.Y.1991) (refusing to limit forfeiture of salary, because corporate officer's "gross misconduct" (e.g., making unwarranted payments to himself) "tainted all dealings ... from late 1987 through August 1989" and salary was paid only within that time period), aff'd without opinion, 952 F.2d 393 (2d Cir.1991).
 
 
 [19]
 One federal district court has limited forfeiture to the transactions as to which the agent was disloyalSee Danish Fur Breeders Ass'n v. Furrico Furs, Inc., 87 Civ. 3043, 1989 WL 37664, at *3 (S.D.N.Y. Apr. 12, 1989) (disloyal purchasing agent need not forfeit commissions earned on the purchase of 20,000 furs, where agent acted loyally with respect to that purchase).
 
 
 [20]
 We note one unresolved issue with respect to MCEL: Kowaloff's rights in connection with the 252,000 shares of MCEL Phansalkar allegedly sold to him. We do not review the district court's finding that Phansalkar sold these shares to Kowaloff or speculate as to what claims, if any, Kowaloff may be able to assert. Instead, we remand to the district court to resolve any issues that arise in this connection
 
 
 [21]
 We do not hold that the faithless servant doctrine entitles AW to retain the capital that Phansalkar invested in MCEL and Headway, $60,000 and $50,000, respectively. AW must return those sums to Phansalkar. We remand to the district court to determine what measure of interest, if any, AW should pay in addition to those sums
 
 
 [22]
 As noted above, the district court found that AW failed to prove that any of the Entrada Networks options actually belonged to, or should have belonged to, AW. It also found that Phansalkar received only 100,000 Sorrento options in Directors' Compensation (even though he was originally promised 300,000) and that AW knew that Phansalkar possessed 100,000 options. We affirm these findings and agree with the district court that the Entrada Networks options do not belong to AW, and that Phansalkar was not disloyal with respect to the Sorrento options. Thus, AW has no right to the Entrada Networks options, and is not entitled to any remedy with respect to the Sorrento options
 
 
 [23]
 If on remand the district court reaches the question of what remedy is appropriate, we note that this is not a straightforward case in which an employee "makes a profit or receives a benefit in connection with transactions conducted by him on behalf of his employer."Western Elec., 41 N.Y.2d at 295, 392 N.Y.S.2d 409, 360 N.E.2d 1091. In such a case, the employer's profit or benefit is assumed to be freely transferable. Thus, where an employee fails to turn over that profit or benefit, the employer would have a choice of remedies, including an action for restitution. See id.; see also Gomez v. Bicknell, 302 A.D.2d 107, 756 N.Y.S.2d 209, 214 (2d Dep't 2002). In this case, in contrast, Phansalkar's ability to transfer or to exercise the options is restricted. Therefore, the district court may find a more suitable remedy elsewhere. See, e.g., Beatty, 225 N.Y. at 386, 122 N.E. 378 ("A constructive trust is the formula through which the conscience of equity finds expression. When property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest, equity converts him into a trustee.")